**Bernard and Odette PORT, Petitioners-Appellants,**

**v.**

**Jack HEARD, Sheriff of Harris County, Texas, Respondent-Appellee.**

No. 84–2523.

United States Court of Appeals, Fifth Circuit.

July 1, 1985.

---

Jerre S. Williams, Circuit Judge, filed dubitante opinion.

Randy Schaffer, Houston, Tex., for petitioners-appellants.

Brad Beers, Calvin A. Hartmann, Jim Lavine, William J. Delmore, III, Asst. Dist. Attys., Houston, Tex., for respondent-appellee.

Before WISDOM, WILLIAMS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Found to be in contempt of a Texas court for refusing to testify before a Texas grand jury, fined $500 each, and confined in the Harris County jail, Bernard and Odette Port petitioned the district court for release by habeas corpus. The Ports challenge the contempt judgments on two grounds: that their testimony was privileged by a parent-child testimonial privilege, and that it was privileged under the Fifth Amendment despite the state court's grant of use immunity. Initially finding that the Ports' appeal was not mooted by their release from custody, we affirm the denial of habeas relief.

### I.

In June 1984, David I. Port, son of Bernard and step-son of Odette, was the primary suspect in the murder of Debra Schatz, a United States Postal Service employee. David's parents (the Ports) were summoned to appear before a state grand jury convened in Houston, Texas. The Ports appeared but invoked their privilege against self-incrimination and refused to testify. The state district court found them in contempt and they were incarcerated in the Harris County jail. A month later the Ports' petition for writ of habeas corpus was granted by the Texas Court of Criminal Appeals. *Ex parte Port*, 674 S.W.2d 772 (Tex.Crim.App.1984).

However, these events commenced to repeat themselves when the Ports were again served with subpoenas to appear before a different grand jury. The state district court granted the state prosecutor's motion to compel the Ports' testimony under a grant of use immunity. The Ports persisted in their silence and were again found to be in contempt. The district court fined the Ports $500 each and ordered the respondent, Jack Heard, the Sheriff of Harris County, to take the Ports into custody until they purged themselves of the contempt.

The Ports' second habeas corpus petition was denied without written opinion by the Texas Court of Criminal Appeals. The Ports then filed their petition with the United States District Court for the Southern District of Texas. Besides asserting their Fifth Amendment privilege against self-incrimination, the Ports urged the court to recognize their privilege, as parents, to refuse to testify against their son. The court denied the petition on September 7, 1984, and this appeal followed. 594 F.Supp. 1212 (D.C.Tex.).

Meanwhile, the Ports appeared before the grand jury on November 7 and 9. The district court determined that Bernard Port had purged himself of the contempt by virtue of his appearance and testimony. No similar determination was made for Odette Port. Bernard Port was released from confinement on the 9th. The grand jury's term expired on January 31, 1985, and it disbanded. Accordingly, the state district court ordered Odette Port's release from confinement on January 30. Payment of the fines has been suspended by personal bond pending appeal. On these subsequent developments, the respondent-appellee Heard (Harris County or the County) has premised his suggestion of mootness filed with this Court.

426

## II.

■ At the outset we note that there is no question but that we have statutory jurisdiction under the "in custody" requirement of the habeas corpus statute, 28 U.S.C. § 2254.[1] Jurisdiction is established for this purpose as long as the petitioner is in the custody of the state when the petition for writ of habeas corpus is filed. *Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554 (1968) (overruling *Parker v. Ellis*, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960)). Subsequent release of the petitioner does not oust the court of statutory jurisdiction. *Id.* The Ports, who were in the Harris County jail at the time their petition was filed, have met the statutory jurisdictional requirement.

However, regardless of the language of the habeas corpus statute, we have jurisdiction to hear only live cases or controversies as delineated in Art. III, § 2 of the Constitution. When this is an issue, the doctrine of mootness supplies the analysis used to discover whether the Article III power may be brought to bear in a particular case. *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556, 42 L.Ed.2d 532 (1975); *Pierce v. Winograd*, 757 F.2d 714, 717 (5th Cir.1985) (Higginbotham, J., dissenting). While both mootness and the "in custody" requirement concern the court's power to hear a dispute, they are analytically distinct issues because they derive from separate grants of authority. *Carafas v. LaVallee*, 391 U.S. at 237–38, 88 S.Ct. at 1559–60; *Escobedo v. Estelle*, 655 F.2d 613, 615 n. 5 (5th Cir.1981). We turn now to the mootness issue.

■ It is generally held that the complete discharge of a purely remedial civil contempt order renders moot the contemnor's direct appeal therefrom. *In re Hunt,* 754 F.2d 1290, 1293 (5th Cir.1985); *Thyssen Inc. v. S/S Chuen On*, 693 F.2d 1171, 1173 n. 3 (5th Cir.1982). Whether a contempt order should be labeled "civil" or "criminal" depends upon "the apparent purpose of the trial court in issuing the contempt judgment." *In re Hunt*, 754 F.2d at 1293. If the purpose is punitive or "designed to vindicate the authority of the court," the contempt is labeled criminal. *Id.* If the contempt judgment is meant to secure compliance with some order of the court or to remedy some harm resulting from noncompliance, the contempt is labeled civil. *Id.* (citing *Thyssen Inc.*, 693 F.2d at 1173–74; *Smith v. Sullivan*, 611 F.2d 1050, 1053 (5th Cir.1980)). However, a contempt order is considered civil only when the intention behind it is wholly coercive or remedial; when it is partly coercive and partly punitive, "the criminal feature of the order is dominant and fixes its character for purposes of review." *Nye v. United States*, 313 U.S. 33, 42–43, 61 S.Ct. 810, 812–813, 85 L.Ed. 1172 (1941) (quoting *Union Tool Co. v. Wilson*, 259 U.S. 107, 110, 42 S.Ct. 427, 428, 66 L.Ed. 848 (1922)); *see In re Stewart*, 571 F.2d 958, 964 n. 4 (5th Cir.1978).

■ The contempt order here was based on Tex.Code Crim.Proc.Ann. art. 20.15 (Vernon 1977).[2] While the language of the statute indicates that its primary purpose is to compel testimony, the fine levied here was not contingent on compliance with the court's demand. In our opinion such a fine, payable regardless of purgation of the contempt, could not be classified as other than punitive. *Compare Cheff v. Schnackenberg*, 384 U.S. 373, 377, 86 S.Ct. 1523,

1. Section 2254(a) provides:
   The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person *in custody* pursuant to the judgment of a State court only on the ground that he is *in custody* in violation of the Constitution or laws or treaties of the United States. (emphasis supplied).

2. Art. 20.15 provides:

When a witness, brought in any manner before a grand jury, refuses to testify, such fact shall be made known to the attorney representing the State or to the court; and the court may compel the witness to answer the question, if it appear to be a proper one, by imposing a fine not exceeding five hundred dollars, and by committing the party to jail until he is willing to testify.

1524, 16 L.Ed.2d 629 (1966) (six month incarceration, not contingent on compliance, was criminal in nature) *with Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966) (prison sentence, imposed for two years or until contemnors complied with order to testify before grand jury, was civil in nature) *and In re Hunt,* 754 F.2d at 1293 (fine, imposed upon noncompliance after a five-day grace period, was civil in nature). The imposition of the fines, purely punitive in nature, converted the contempt judgments here into criminal judgments, at least for our purposes.

It is clear enough that release of the Ports from confinement would have mooted their petitions had confinement been the only sanction imposed, the contempt being, in that case, purely civil in nature. *See In re Campbell,* 628 F.2d 1260, 1261 (9th Cir. 1980) (restatement of principle that purgation moots challenge of civil contempt judgment), and cases cited therein. Conversely, there are numerous cases holding that a criminal contempt judgment is not mooted by the contemnor's release from confinement. *See, e.g., Ridgway v. Baker,* 720 F.2d 1409, 1411–12 n. 2 (5th Cir.1983) (contemnor ordered to pay arrearages in child support; collateral consequences present); *United States v. Camil,* 497 F.2d 225, 227–28 (5th Cir.1974) (two hour confinement; capable of repetition but evasive of review; collateral consequences); *Wolfe v. Coleman,* 681 F.2d 1302, 1305–06 (11th Cir. 1982) (forty-five day sentence; collateral consequences). *But see, e.g., Broughton v. North Carolina,* 717 F.2d 147, 149 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1917, 80 L.Ed.2d 464 (1984) (thirty day sentence for criminal contempt; habeas challenge mooted by release because no collateral consequences present). However, the holding in *Broughton,* and the use of the collateral consequences doctrine in all these cases, makes clear that the mootness of contempt judgments turns, not on the formalistic enterprise of labeling the contempt judgment, but on the presence *vel non* of a live controversy. Thus, had confinement been the only sanction imposed on the Ports, the controversy would have ended when they purged themselves of the contempt or, for other reasons, were released from custody. However, since the court also imposed a fine, contingent neither on compliance nor on any other event within the Ports' control, we must now determine whether the fine alone preserves their habeas petition from "ending 'ignominiously in the limbo of mootness.'" *Sibron v. New York,* 392 U.S. 40, 55, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968) (quoting *Parker v. Ellis,* 362 U.S. 574, 577, 80 S.Ct. 909, 911, 4 L.Ed.2d 963 (1960) (dissenting opinion)).

The fine was a direct consequence of the judgment challenged. Thus, we are faced with a novel issue: whether a fine alone can preserve a habeas petition from mootness once jurisdiction has properly attached in terms of the "in custody" requirement. *Cf. Spring v. Caldwell,* 692 F.2d 994, 996–98 (5th Cir.1982) (conviction punished solely by fine not sufficient to satisfy "in custody" jurisdictional requirement). In dictum, the Seventh Circuit has stated that the collateral consequences flowing from a fine-only conviction "although insufficient to establish custody and thus [statutory] jurisdiction, are enough to keep a petition from becoming moot by the petitioner's release from custody." *Harrison v. Indiana,* 597 F.2d 115, 118 (7th Cir.1979). However, the firmer ground on which to place the decision is that the fine, as a direct consequence of the contempt convictions, preserves the Ports' stake in the merits of the appeal they bring before us, despite their release from custody. Since the Ports are still threatened with a direct consequence of the convictions, the collateral consequences doctrine of *Carafas v. LaVallee,* 391 U.S. at 238, 88 S.Ct. at 1559, is not implicated.

The County argues that since the Ports failed to request specific relief from the fines in their habeas petition, the fines cannot preserve the controversy. In *Lane v. Williams,* 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982), the Court recently limited the mootness doctrine. The petitioners

in *Lane*, who were challenging confinement imposed upon them for violating parole after serving their main sentences, which were imposed after guilty pleas, had only requested release from the parole terms, which had ended by the time of the appeal. The Court held that the cases were moot. *Id.* at 630–31, 102 S.Ct. at 1326–27. Had the petitioners challenged the underlying convictions and requested an opportunity to replead, the Court stated, the cases would not have been moot. *Id.* The Court thus evinced a tendency to favor specific requests for relief in habeas petitions. *See id.* at 631 n. 11, 102 S.Ct. at 1327 n. 11. Our holding, however, is consistent with *Lane* since the Ports' petition may reasonably be read to request relief from the fine as well as the confinement, whereas in *Lane* to have construed the petitions to include a request to replead would have defied common sense. *Id.* The Ports are clearly challenging more than just their confinement. *United States v. Cooper*, 725 F.2d 756, 758 (D.C.Cir.1984). They are challenging the Court's power to hold them in contempt, from which both confinement and fine followed, and we decline to require them to name their remedy when the challenge, and the desired remedy, are clear. To do so would be to subjugate fairness and common sense to technical nicety. We do not read *Lane* to require this.

█ The fine is, without doubt, a disability giving the Ports a "substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on [them]." *Fiswick v. United States*, 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946), *quoted in Carafas v. LaVallee*, 391 U.S. at 237, 88 S.Ct. at 1559. Both *Fiswick* and *Carafas* dealt with collateral consequences. The Ports' stake in the merits is obviously not dissipated in degree or in significance because it is direct rather

than collateral. Quite the contrary. Further, the state court's power to impose the fine depends upon our decision on the merits. *See United States v. Morgan*, 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248 (1954) (challenge to conviction not moot where "power to remedy an invalid sentence exists"). Thus, the Ports' stake in this appeal is live and actual, not "abstract, feigned, or hypothetical," *Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968), and we therefore have power, under Article III, to hear the merits of their challenge. *Cf. Ex parte Shorthouse*, 640 S.W.2d 924, 927 (Tex. Crim.App.1982) (en banc) (contempt judgment under Tex.Code Crim.Proc.Ann. art. 20.15 was moot as to confinement but not as to $500 fine where contemnor was discharged from custody).

### III.

The Ports invite us to recognize their right not to testify against their child. They do not rely on Fed.R.Evid. 501,[3] which, after all, would not have applied in the state grand jury proceeding. Rather, they articulate three constitutional foundations for the parent-child testimonial privilege. The first foundation is constructed of the pronouncements of the Supreme Court creating a familial right to privacy. We do not think, however, that that right supports the claimed privilege.

### A.

Whether located in the "penumbras" and "emanations" of the Bill of Rights, *Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965), in the Ninth Amendment, *id.* at 486, 85 S.Ct. at 1682 (Goldberg, J., concurring), or in the concept of "liberty" as derived from the Fourteenth Amendment, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625,

---

**3.** Fed.R.Evid. 501 provides, in part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

626, 67 L.Ed. 1042 (1923); *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), the eminent position of the familial right to privacy in our jurisprudence cannot now be gainsaid. However, the right extends only to "matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972). The privacy decisions "make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' are included in th[e] guarantee of personal privacy." *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726. Thus, the Court has seen fit to protect such private familial activities as marriage, *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), procreation, *Skinner v. Oklahoma,* 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113–12, 86 L.Ed. 1655 (1942), contraception, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; *Eisenstadt v. Baird,* 405 U.S. at 453–54, 92 S.Ct. at 1038–39, and child rearing and education, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

Only two courts, however, have deemed the parent-child testimonial privilege fundamental enough to afford it constitutional protection on privacy grounds. *See In re*

*Agosto,* 553 F.Supp. 1298, 1325–26 (D.Nev. 1983); *In re A & M,* 61 A.D.2d 426, 403 N.Y.S.2d 375, 378–79 (1978). Most courts have declined to recognize the privilege even on common law grounds "in the light of reason and experience" under Fed.R. Evid. 501. For example,[4] in *In re Grand Jury Proceedings of Starr,* 647 F.2d 511 (5th Cir.1981), this Court declined to privilege a communication to the appellant from her mother and father and distinguished *In re A & M* and other New York cases recognizing the privilege on the ground "that they involved confidential communications from the child to the parent, and were founded for the most part on the desire to avoid discouraging a child from confiding in his parents." *Id.* at 512–13 n. 4. Invoking precisely that desire and the underlying interest in fostering a parent's ability to educate and nurture her child which, it is contended, depends upon the child's trust in his parents, the Ports distinguish *Starr.* Thus, it is said, the very "sanctity and integrity of the family unit" are threatened by the State's power to compel parents to betray this trust by compelling them to reveal their child's confidences. We do not derogate these values, however, if we are unable to find them to be protected by the Constitution.

In *United States v. Penn,* 647 F.2d 876 (9th Cir.) (en banc), *cert. denied,* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980), the court refused to shield, on constitutional grounds, a child's revelation to a police officer of the location of his parents' drugs, although the child had been bribed by the officer to do so.[5] In holding that the

---

**4.** *See also, In re Grand Jury Subpoena of Santarelli,* 740 F.2d 816, 817 (11th Cir.1984) (no privilege to refuse to testify against father under Fed.R.Evid. 501); *Matthews v. United States,* 714 F.2d 223, 224–25 (2nd Cir.1983) (no privilege to refuse to testify against in-law under Rule 501); *United States v. Jones,* 683 F.2d 817, 819 (4th Cir.1982) (no Rule 501 privilege for adult child to refuse to testify against parent, especially since it would involve no communication with parent); *United States ex rel. Riley v. Franzen,* 653 F.2d 1153, 1160 (7th Cir.), *cert. denied,* 454 U.S. 1067, 102 S.Ct. 617, 70 L.Ed.2d 602 (1981) (dictum suggesting child's communication with father would not be privileged because creation

of such is a matter for the legislature); *In re Kinoy,* 326 F.Supp. 400, 406 (S.D.N.Y.1970) (no privilege to refuse to testify against child before grand jury where child is not a "target" witness and thus father's testimony would not necessarily incriminate child).

**5.** The court also declined to create a parent-child privilege under Rule 501, holding that "[t]here is no judicially or legislatively recognized general 'family' privilege." *United States v. Penn,* 647 F.2d at 885 (citing *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *United States v. Lefkowitz,*

child's revelation did not require exclusion from evidence of the contraband, the court found that the officer's act did not intrude on the family's privacy rights as guaranteed by substantive due process since the case "[did] not involve the special intimacy characteristic of the areas of sexual relations and reproduction, nor [did] it involve a fundamental parental right." *Id.* at 883–84 (citing *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). The court held, therefore, that "no 'family' interest of constitutional stature [was] implicated." *Id.* at 884. The Ports have invoked no family interest of any greater constitutional stature, although they might have invoked interests of greater social or psychological gravity.

■ The Ports argue that the parent-child privilege is favored by commentators[6] and is as justifiable, in terms of the interests concerned, as the marital communications privilege. Be that as it may, the marital privilege has never been placed on a constitutional footing. While its origins are somewhat obscure, we know that the marital privilege is bequeathed to us by the long evolution of the common law, not by constitutional adjudication. *See Trammel v. United States*, 445 U.S. 40, 43–45, 100 S.Ct. 906, 908–910, 63 L.Ed.2d 186 (1980); 8 J. Wigmore, Evidence § 2227 (McNaughton rev. 1961) (The privilege is "involved . . . in a tantalizing obscurity"). Three courts, including this one, have explicitly rejected the constitutional basis for the marital privilege. *La Roche v. Wainwright*, 599 F.2d 722, 726 (5th Cir.1979); *United States v. Lefkowitz*, 618 F.2d 1313, 1319 (9th Cir.),

*cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *United States v. Doe,* 478 F.2d 194, 195 (1st Cir.1973). In *La Roche* we wrote:

> As for La Roche's asserted constitutional claim, we see no persuasive reason to extend the right of privacy, based as it is on "penumbras and emanations" of other more explicit constitutional rights, to evidentiary matters protecting marital relationships, long thought to be uniquely within the regulatory province of the individual states.

599 F.2d at 726. In the light of *Penn* and *La Roche*, we likewise perceive no justification for extending the right of privacy so as to create a constitutional right against child-incrimination.

■ Were this a Rule 501 case our holding might be different, since, in terms of the interests at stake, this case presents a compelling argument in favor of recognition.[7] Since it is not, however, we are unable to hold that Texas, by denying the privilege to the Ports, has in any way trammeled a right secured to them by the Constitution. The delicate balancing of the interests implicated is more properly a concern of the legislature of that state. *See La Roche,* 599 F.2d at 726; *United States ex rel. Riley v. Franzen,* 653 F.2d at 1160; Comment, Underprivileged Communications: The Rationale for a Parent-Child Testimonial Privilege, 36 Sw.L.J. 1175, 1194–95 (1983) (advocating legislative creation of privilege); Coburn, Child-Parent Communications: Spare the Privilege and Spoil the Child, 74 Dick.L.Rev. 599 (1970) (same).

### B.

■ The Ports contend that the Equal Protection Clause of the Fourteenth

---

618 F.2d 1313 (9th Cir.), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980)).

**6.** *See, e.g.,* Comment, Underprivileged Communications: The Rationale for a Parent-Child Testimonial Privilege, 36 Sw.L.J. 1175 (1983); Comment, The Child-Parent Privilege: A Proposal, 47 Fordham L.Rev. 771 (1979); Comment, From the Mouths of Babes: Does the Constitutional

Right of Privacy Mandate a Parent-Child Privilege, 1978 B.Y.U.L.Rev. 1002; Coburn, Child-Parent Communications: Spare the Privilege and Spoil the Child, 74 Dick.L.Rev. 599 (1970).

**7.** Of course, the argument in support of granting the privilege to Odette Port is less compelling inasmuch as she is related to David by marriage rather than descent.

Amendment guarantees their right to the parental privilege since Texas has recognized a marital privilege. The right to refuse to testify against one's child is not, as we hold today and as the Ports concede, a fundamental right. Nor does the distinction between the marital and parental privileges involve a suspect class. We therefore need not strictly scrutinize the classification as required in such cases. *Clements v. Fashing*, 457 U.S. 957, 963, 968, 102 S.Ct. 2836, 2843, 2846, 73 L.Ed.2d 508 (1982). Under traditional equal protection analysis, then, the State's classification is presumed constitutional. *Id.* at 963, 102 S.Ct. at 2843. "[D]istinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Id.*

It is beyond dispute that the pursuit of truth in legal proceedings is a legitimate state end. As a rule, the courts are entitled to the benefit of every person's evidence and privileges, as "exceptions to t[his] demand ... are not lightly created nor expansively construed for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *see also Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting) (a privilege should be permitted only when it serves a public goal transcending the pursuit of truth). We are left only to inquire whether Texas' choice in protecting marital but not parent-child communications is rationally based.

While not dispositive, the fact that this distinction exists in nearly every other state is a telling blow to the Ports' claim that the distinction is irrational. Beyond this, it seems clear to us that the state of Texas has merely balanced the interests at

stake and found the interest in the search for truth more compelling than those served by the parental privilege. That the state did not reach the same conclusion with respect to the marital privilege is testimony, not of illicit discrimination, but of the State's recognition of the fact that that privilege is so deeply embedded in the common law tradition that to uproot it would cause undue disruption. This evaluation of the costs associated with legislative revision of the common law is quite rational. Further, the distinction is also rationally based upon an evaluation of the parent-child relationship, based as it is on the bonds of blood, as less susceptible of dissolution and therefore less in need of judicial protection than the marital relationship. That we might disagree with either of these evaluations is irrelevant for the "judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Texas' refusal to grant a parent-child privilege did not deny the Ports the equal protection of the laws.

### C.

The Ports' final argument in support of their right not to testify against their son finds its basis in the free exercise clause of the First Amendment. They have asserted that their sincere adherence to the tenets of their religion—Judaism—prohibits them from testifying against their son. They invoke the Talmudic proscription, applied in Rabbinical Courts, against testifying against one's child and the generalized obligation to "honor" one's child. Without inquiring into the sincerity of their beliefs [8] or the actual presence in the Jewish religion of such a proscription applicable in secular courts,[9] we are still compelled to

---

8. While the courts may inquire into the sincerity of the believer, *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965), we choose not to do so here.

9. *See Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–1431, 67 L.Ed.2d 624 (1981) ("... judicial process is singularly

hold that the Ports' right freely to exercise their religious beliefs was not violated.

"The State may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the public interest in securing complete grand jury investigation of crimes was found to be sufficient to override the free speech claims of journalists who wished to conceal their informants' identities from that body. The Court located the magnitude of the public interest in the historic and constitutionally-rooted [10] function of the grand jury and held that the principle that the public is entitled to every person's evidence "is particularly applicable to grand jury proceedings." *Id.* at 686–88, 92 S.Ct. at 2659–60.

■ In *Smilow v. United States*, 465 F.2d 802 (2nd Cir.), *vacated on other grounds*, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972),[11] the court, relying on *Branzburg*, denied to a grand jury witness the right to refuse to testify on grounds of religious belief. The witness believed he would suffer "divine punishment" if he testified in connection with the grand jury's investigation of a fire bombing in which a woman was killed. *Id.* at 804. The court held that the witness's First Amendment rights were outweighed by "the compelling state interest in this case in uncovering evidence of serious crimes of violence." *Id.* Noting that were the witness merely asking for a delay in the proceedings for

religious purposes the result would have been different, the court distinguished the witness's claim "that he can keep forever hidden possible evidence of a serious crime." *Id.* This concealment the court could not countenance, even on free exercise grounds. Nor can we. We hold that in the context of this case, the state's interest in procuring every person's testimony for the thorough investigation of the crime of homicide outweighs the Ports' First Amendment claims, but only if the state's procurement of the testimony was "the least restrictive means of achieving" that interest. *Thomas v. Review Board*, 450 U.S. at 718, 101 S.Ct. at 1432.

The Ports argue that their testimony was unnecessary to secure an indictment against their son and that, therefore, compelling it was not the least restrictive means of achieving the state's interest. At the hearing before the state district court, Brad Beers, the prosecutor assigned to the case, testified that it was possible that the grand jury could return an indictment against David Port without the Ports' testimony. He went so far as to state that an indictment might even issue without his (Beers's) presence at the grand jury hearing. The reason he gave was that the media had publicized accounts of David Port's confession to the murder, and that this alone might cause the grand jury to return an indictment. Beers went on to say that a grand jury could return an indictment in any case without hearing any evidence whatsoever. He also said that the state had a "prima facie" case against David Port without his parents' testimony

---

ill-equipped to resolve [intrafaith] differences in relation to the Religion Clauses."); *United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir.1981), *cert. denied sub. nom., Phillips v. United States*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

**10.** The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

**11.** On petition for writ of certiorari, the Supreme Court vacated upon the representation by

the Solicitor General that electronic surveillance had been used against Smilow, a fact the United States Attorney had denied in all prior hearings and a fact that formed one ground of Smilow's justification of his silence before the grand jury. On remand to the Court of Appeals, the case was remanded to the district court to consider the new development. *United States v. Smilow*, 472 F.2d 1193, 1194 (2nd Cir.1973). However, the Court of Appeals appeared to reaffirm its holding on the First Amendment issue. *Id.* at 1194 n. 1.

"because a charge is filed [against him]." However, Beers stated that the Ports' testimony was essential to a complete investigation of the murder. It is also undisputed that the Ports had exclusive knowledge of certain facts concerning the events in their home preceding and following the alleged murder as well as communications from David during the same period of time.[12]

Contrary to the Ports' position, the state interest with which we are concerned is the ultimate interest in pursuing the truth in regard to this murder, not the contingent and intermediate interest in securing an indictment against David Port. Thus, the Ports' argument would prove too much. It would render almost all grand jury testimony subject to every First Amendment or other claim of privilege since many indictments can be obtained without adducing any testimony whatever. As *Branzburg* and *Smilow* illustrate, however, the state's interest is in discovering the truth about a crime and First Amendment interests may be subjugated to this interest in the proper circumstances. The proper circumstances are present here for, just as in *Smilow,* the witnesses have "vital relevant information" concerning the crime and this information cannot "conveniently be obtained from others."[13] *Smilow,* 465 F.2d at 804–05. The state's means of obtaining the information is narrowly enough drawn to serve its compelling interest in discovering the truth about this crime. Were the Ports' testimony unnecessary in this process or reasonably obtainable from other sources, our holding might differ. We leave such questions for another day.

## IV.

◼ At the request of the Harris County District Attorney, the state district court granted the Ports immunity from the use in a later prosecution of any testimony given to the grand jury. The Ports claim that the court had no power to grant use immunity and that, therefore, it could not compel them to testify over their claim of a Fifth Amendment privilege against self-incrimination.

The Ports argue that without statutory authority the judiciary may not grant immunity. That proposition is generally accepted. *See, e.g., United States v. D'Apice,* 664 F.2d 75, 77 (5th Cir.1981). However, we have no occasion to consider the intricacies of this issue, particularly whether the requirement has constitutional stature, since on any view of the matter the Texas immunity scheme is derived from statutory authority.

That scheme was recently articulated as follows:

> Though a procedure for grant of immunity has not been expressly provided by the Legislature, as the Court demonstrated in *Ex parte Muncy,* 72 Tex.Cr.R. 541, 163 S.W. 29 (1914), "The right under our law of the district attorney, with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment has never been seriously questioned in this state," *id.,* [163 S.W.] at 38. The then extant statutory authority for the grant, *id.,* [163 S.W.] at 45 and 54, similar to provisions in predecessor codes cited in earlier decisions to the same effect, *e.g., Barrara v. State,* 42 Tex. 260, 263 (1875); *Camron v. State,* 32 Tex.Cr.R. 180, 22 S.W. 682 (1893); *Ex parte Greenhaw,* 41 Tex. Cr.R. 278, 53 S.W. 1024 (1899), have since been melded into Article 32.02 V.A.C.C.P. *See Washburn v. State,* 164 Tex.Cr.R. 448, 299 S.W.2d 706 (1956).

12. David Port was suspected of murdering Ms. Schatz in the Port home. Before discovering that their son was a suspect, the Ports had given police officers information regarding, among other things, David's activities on the day of the murder and the physical condition of the house after the murder. It is undisputed that these facts are solely within the knowledge of the three Ports.

13. To argue, as the Ports do, that procuring their testimony would have certain tactical side effects beneficial to the state, such as gathering facts to rebut a possible insanity defense at trial or settling the privilege issue before trial, is not to argue that the testimony was unnecessary to the primary quest for the truth about Debra Schatz's murder.

*Ex parte Moorehouse*, 614 S.W.2d 450, 453 n. 3 (Tex.Crim.App.1981) (Clinton, J., concurring), *quoted in Autry v. Estelle*, 706 F.2d 1394, 1402 (5th Cir.1983). In rejecting an earlier challenge to a trial court's power to grant use immunity,[14] the Court of Criminal Appeals held that

> [a]rts. 653 and 577, V.A.C.C.P., together with other provisions of the Code relating to the dismissal of a prosecution by the court upon motion of the attorney for the state, furnish all of the statutory authority necessary to empower the district attorney and the court to grant immunity to the witness and require her to testify.

*Ex parte Joseph*, 172 Tex.Cr.R. 355, 356 S.W.2d 789, 791 (1962) Articles 577 and 653 are the precursors of Tex.Code Crim.Proc. Ann. arts. 32.02 and 36.09 (Vernon 1966 and 1981), respectively.[15] It is clear that under Texas law art. 32.02 provides the statutory authority for the granting of use immunity.

That we might quarrel with the Texas courts' construction of this statutory scheme is immaterial to a habeas challenge unless our disagreement is founded in the "Constitution or laws ... of the United States." 28 U.S.C. § 2254. Any such quarrel would, however, be merely a matter of Texas jurisprudence and would not in any sense assume constitutional proportions. *Seaton v. Procunier*, 750 F.2d 366, 368 (5th Cir.1985). We do not presume to review Texas' interpretation of its own law particularly where the edicts of that state's highest court are concerned. *Id.* (citing *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir.1983), *cert. denied sub. nom., Moreno v. McKaskle*, —— U.S. ——, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984)).[16] We therefore conclude that the state district court's grant of use immunity to the Ports was supported by statutory authority.

■ The Ports' final argument is that their Fifth Amendment rights were not adequately protected by the grant of use immunity by the state court, since it would

**14.** The Ports' argument that Texas law, as stated in *Hughes v. State*, 62 Tex.Cr.R. 288, 136 S.W. 1068, 1071 (1911), requires a grant of transactional immunity rather than use immunity is misguided. In *Ex parte Joseph*, 172 Tex.Cr.R. 355, 356 S.W.2d 789 (1962), cited and quoted in the text, the Court of Criminal Appeals affirmed a grant of use immunity that was approved by the district court. It was court approval that was lacking in *Hughes* and it was this deficiency, not any deficiency in the nature of the immunity, that the *Hughes* court intended to cure. *Hughes*, 136 S.W. at 1070.

The Ports do not argue that the grant of use immunity was constitutionally infirm in not being coextensive with their Fifth Amendment privilege in the state prosecution. *See Kastigar v. United States*, 406 U.S. 441, 448–59, 92 S.Ct. 1653, 1658–64, 32 L.Ed.2d 212 (1972).

**15.** Art. 32.02 provides as follows:

> The attorney representing the State may, by permission of the court, dismiss a criminal action at any time upon filing a written statement with the papers in the case setting out his reasons for such dismissal, which shall be incorporated in the judgment of dismissal. No case shall be dismissed without the consent of the presiding judge. Art. 577 was identical except that it referred to the "district or county attorney" rather than the "attorney representing the State."

Art. 36.09 provides as follows:

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

Art. 653, one of the sources for art. 36.09, provided as follows:

> The State's attorney may, at any time, under the rules provided in this Code, dismiss a prosecution as to one or more defendants jointly indicted with others; and the person so discharged may be used as a witness by either party.

**16.** Hence, state court cases such as *Apodaca v. Viramontes*, 53 N.M. 514, 212 P.2d 425, 430 (1949), construing the requirements of state law regarding the necessity of a statutory basis for granting immunity, are inapposite.

not protect them from use of their compelled testimony in a federal prosecution, should one eventuate. Conceding that the Supreme Court has prohibited the federal government from using statements compelled in state prosecutions by a promise of immunity, *Murphy v. Waterfront Commission of New York*, 378 U.S. 52, 79 & n. 18, 84 S.Ct. 1594, 1609 & n. 18, 12 L.Ed.2d 678 (1964), the Ports gather strength for their final attack from *Pillsbury Company v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983), which, they contend, "may have ... undercut" *Murphy.*

In *Conboy*, the Court held that a deponent's civil deposition testimony that closely tracks testimony the use of which had been previously immunized in a criminal prosecution is not automatically immunized under 18 U.S.C. § 6002 "and therefore may not be compelled over a valid assertion of his Fifth Amendment privilege." 459 U.S. at 263–64, 103 S.Ct. at 617–18. Not only did the Court strictly limit its holding, *id.* at 264 n. 24, 103 S.Ct. at 618 n. 24, but even a cursory reading of the opinion makes clear that the holding was founded on an interpretation of the federal statute, *id.* at 255–56, 103 S.Ct. at 613–14, and thus has no effect on the constitutional foundation of *Murphy. See Murphy*, 378 U.S. at 79 & n. 18, 84 S.Ct. at 1609 & n. 18. The Ports' argument is therefore meritless.

For these reasons the district court's denial of the Ports' petition for a writ of habeas corpus is AFFIRMED.

JERRE S. WILLIAMS, dubitante:

I regret that I must remain doubtful with respect to the Court's disposition of the issue of mootness in this case. The mootness issue under these facts is serious, difficult, and wholly novel.

The Ports were convicted of both civil and criminal contempt. They were fined $500 each for the criminal contempt and were incarcerated for the civil contempt until they purged themselves. They brought a habeas corpus proceeding which properly attacked their incarceration. The law is clear that jurisdiction having attached as to the issue of the legality of the incarceration, that issue would remain viable in this case after release from incarceration as long as there were collateral consequences. There are none. The $500 fine for criminal contempt is not a collateral consequence of the civil contempt conviction.

Thus, this Court has posed to it the issue of whether properly established jurisdiction in a habeas corpus proceeding to test the validity of being held in custody under a conviction for a civil contempt can, after that issue is wholly removed from the case, continue as a vehicle to determine the validity of the conviction for criminal contempt and the $500 fine for the same offense.

This issue was never briefed by appellants because the suit was brought and appealed and briefed while they were still held in custody. Appellee, the Sheriff, only briefed the issue casually by means of an addendum to his brief.

I see possible serious implications in allowing the great writ of habeas corpus to be used as a means of challenging the validity of a fine in any criminal case. We clearly so held in *Spring v. Caldwell*, 692 F.2d 994 (5th Cir.1982). Further, the Ports did not challenge the fines in their habeas corpus petitions. The entire focus of their case was the attempt to establish that their conviction for civil contempt and their incarceration until they purged themselves of that contempt was invalid.

The holding of the majority would allow someone in the situation of the Ports to file a habeas corpus petition as soon as imprisoned for civil contempt, without mentioning the fine for criminal contempt, purge themselves the next day, but then proceed through the extraordinary remedy of habeas corpus to litigate the merits of the criminal contempt conviction which resulted only in a fine. I am doubtful that this Court should decide this novel question, serious in its consequences, without the issue being raised by appellants in their petition and without the issue being fully briefed by the parties to enable this Court to give the

consideration to this issue which it deserves.

On the merits, since the merits are reached by a majority vote of this Court, I am wholly in agreement with the scholarly and effective opinion by my brother Hill that the Ports did not have available to them a claim of privilege, either against self-incrimination or because of an asserted parent-child testimonial immunity.