11 F.3d 1072
 28 U.S.P.Q.2d 1847
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
COLLINS LICENSING, L.P., Plaintiff/Cross-Appellant,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant-Appellant,
 Nos. 92-1201, 92-1294 and 92-1302.
 United States Court of Appeals, Federal Circuit.
 Nov. 5, 1993.
 
 W.D.Tex.
 VACATED AND REMANDED.
 BEFORE NIES, Chief Judge, PLAGER, Circuit Judge, and COHN, District Judge.*
 PER CURIAM.
 
 
 1
 Collins Licensing, L.P., sued American Telephone and Telegraph Company (AT & T) in the District Court for the Western District of Texas for infringement of U.S. Patent No. 3,956,593 ('593 patent). After a jury trial, judgment was entered against AT & T in accordance with special verdicts that claims 29, 34, 37-39, 43 and 47-48 are not invalid and that AT & T had infringed only claim 29 of the asserted claims. The court further ruled that the patent was not unenforceable. Both parties appeal, seeking reversal of the rulings adverse to their positions. AT & T also appeals from the order of the district court holding it in contempt. Because we conclude that claim 29 is invalid and that the verdicts of non-infringement of the other asserted claims cannot be overturned, we reverse the judgment of liability. We vacate and remand for reconsideration of the contempt order.
 
 I.
 Validity of Claim 29
 
 2
 AT & T contends that three prior art references render claim 29 obvious. The first, A. Mack & B. Patrusky, Time Division Digital Switch Matrix Technique Evaluation, in IEEE International Conference on Communications 40-1 (June 1972), evaluates four different digital switch architectures for cost, reliability and grade of service. Another prior art reference, Guido Granello, Switching Networks for PCM Time Division Exchanges, in International Switching Symposium Record 81 (June 1972), analyzes the optimal switching configuration for tandem PCM exchanges.[1] The final piece of prior art, Rome Air Development Center, Final Technical Report RADC-TR-72-27, Integrated Circuit/Message Switch Feasibility Model Development, Test, and Evaluation (1972) (hereinafter "Final Technical Report") consists of several volumes of technical reports on digital telephony. Because we hold that claim 29 would have been obvious, if not fully anticipated by the prior art, we agree that the district court erred by failing to grant AT & T's motion for judgment as a matter of law.
 
 
 3
 Claim 29, the only claim the jury found infringed by AT & T, provides:
 
 
 4
 The switch of claim 27, wherein said individual time division digital signal switch element means are in two basic configurations, a space switch eleme[n]t and a time switch element interconnectable in pluralities of each said space and time switch elements through an extensive range of time division multiplex switch sizes and configurations.
 
 
 5
 The claim from which Claim 29 depends, Claim 27, was cancelled by the PTO during reexamination and thus cannot independently serve as a basis for infringement. Collins does not argue here that claim 27 is itself patentable over the aforementioned prior art. Claim 27 reads:
 
 
 6
 In a switch for interconnecting between data incoming and outgoing digital time division multiplex communications lines:
 
 
 7
 individual time division digital signal switch element control means, including,
 
 
 8
 control store means for storage of the status of interstage links in a switch;
 
 
 9
 cyclic retrieval means connected to said control store means for cyclic retrieval of stored status information from said control store means;
 
 
 10
 control data source means interconnected with said control store means for interrogating and modifying information stored in said control store means;
 
 
 11
 and step said control signal input means to said control store means for activating information retrieval and modification.
 
 
 12
 Claim 29 differs from claim 27 in that claim 29 adds a modular switch architecture. The dispute of the parties concerns whether the prior art teaches this modular architecture, i.e., a digital telephone switch with individually controlled, distinct time and space switch components. Both the inventors during prosecution of the '593 patent, and Collins during the subsequent reexaminations, stressed the invention's use of standardized, individually controlled time and space switch components, which allow for flexibility in switch implementation. The specification of the '593 patent states that:
 
 
 13
 It is ... a principal object of this invention to provide a time space time (TST) switch system achieving significant improvements in operation and in minimized equipment costs, in using two basic modules, a time switching module and a space switching module....
 
 
 14
 Another object is to provide such a TST switch system wherein the two basic modules may be interconnected to realize virtually any size and configuration of a time division switch.
 
 
 15
 Collins later indicated that the patented invention employed "the ingenious and novel modularization of the time and space switch elements, associating individual control stores with each element." Request for Reexamination at 9 (June 21, 1989) (emphasis added).
 
 
 16
 Our examination of the prior art reveals that both Granello, supra, and the Final Technical Report, supra, teach individual space and time switch modules. Where depicting "[t]he graph representation of a three-stage network" in Figure 5, Granello, supra at 84, plainly illustrates that each stage is composed of multiple discrete components. While these modules are interconnected within a stage, and are further connected to other components in other stages, they are individually controlled, distinct modules. Granello explains that "[t]he graphs shown in Fig. 5 can be implemented as follows: i) Time-space-time (TST) implementation. Stages 1 and 3 are made up of time matrices, stage 2 is a space matrix." Id. at 85. Where the Final Technical Report refers to the three stages of the TST switch, it indicates that "different primary, secondary and tertiary stages should be package[d] [sic] on separate modules ... [with] any given primary, secondary or [sic, tertiary] function including control ... packaged wholly on one to three cards...." 3 Final Technical Report at 92. All three references further teach the advantages of a modular design, allowing flexible implementation of switches through different space and time switch combinations. Both Mack & Patrusky, supra at 40-5, and Granello, supra at 87, further provide data on cost, reliability and other factors for different sizes of differently configured switches. See also 3 Final Technical Report, supra at 92.
 
 
 17
 The additional limitations of claim 29 are taught within the prior art references. Mack & Patrusky, supra at 40-1, indicates that the architectural approach of the compared switches "had to be modular." The Final Technical Report also makes extensive use of a "basic module" for purposes of its analysis. 3 Final Technical Report, supra at 73. The prior art references thus expressly teach one of skill in the art to employ uniform, interconnectible switch components. The tabular data that the references provide on different switches also indicates that no switch architecture predominates; instead, an optimal switch architecture varies depending upon the size of the subscriber base, traffic patterns, reliability concerns and other factors. In any event, a well known principle of design engineering is that a modular design is desirable to achieve flexibility in the modification of existing switches and the implementation of new ones.
 
 
 18
 In reaching this conclusion, we are not unmindful that on reexamination the PTO, after initial rejection of claim 29 based on Mack & Patrusky, supra, withdrew that rejection. However, the basis for allowance indicates a misunderstanding that the prior art did not disclose, inter alia, modular time and space switches under individual control. On the uncontrovertable record before us, we reach the opposite conclusion. "[W]e see nothing untoward about the PTO upholding the validity of a reexamined patent which the ... court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it." Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1428, 7 USPQ2d 1152, 1157 (Fed.Cir.1988). We review a trial record which includes live testimony and cross-examination, none of which was before the examiner. The governing statute and regulations limit third party involvement in a reexamination to the initiation of the procedure. 35 U.S.C. Secs. 304, 305 (1988); 37 C.F.R. Sec. 1.510 (1992). Our precedent mandates that courts considering the validity of reexamined patents proceed on the record in the litigation, and not merely conform to or review exclusively the examiner's actions during the reexamination proceedings. Greenwood v. Hattori Seiko Co., 900 F.2d 238, 241, 14 USPQ2d 1474, 1476 (Fed.Cir.1990).
 
 
 19
 We also recognize the great deference due to jury verdicts. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1546, 220 USPQ 193, 196 (Fed.Cir.1983). However, the jury would have had to find that the prior art does not show individual control of a time module or a space module. On this record, substantial evidence does not support such a finding. "Deference due a jury's fact findings in a civil case is not so great ... as to require acceptance of findings where, as here, these findings are clearly and unquestionably not supported by substantial evidence. To do so would render a trial and the submission of evidence a farce." Connell, 722 F.2d at 1546, 220 USPQ at 196. Because the judgment cannot stand upon application of the statutory standard of 35 U.S.C. Sec. 103 (if not Sec. 102), we reverse the denial of AT & T's motion for judgment as a matter of law respecting the invalidity of claim 29. See Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 9 USPQ2d 1417 (Fed.Cir.1988), cert. denied, 493 U.S. 814 (1989).
 
 II.
 Infringement
 
 20
 In its cross-appeal, Collins asserts that the jury erroneously found that AT & T did not infringe claims 34, 37-39, 43, and 47-48 of the '593 patent. On appeal, Collins argues only that those claims were literally infringed.
 
 
 21
 Claim 34 of the '593 patent provides (emphasis added):
 
 
 22
 In a switch for interconnecting between data incoming and outgoing digital time division multiplex communication lines, said switch having both time and space stages and interstage links therebetween, the improvement comprising:
 
 
 23
 a plurality of individual time division digital signal switch element control modules, each such module combined with an associated time signal path switching means of said switch for switching between the time slots of the inputs and outputs of a single digital time division multiplex communication line of said switch, but said module not being combined with any space signal path switching means, or said module is combined with an associated space signal path switching means of said switch for switching selected time slots from any of multiple time division digital multiplex communication lines of said switch to a single digital time division multiplex communication line, but said module not being combined with any time signal path switching means of said switch, to form a time or space switch element, each control module including its own control store means for storage of the status of said interstage links in said switch;
 
 
 24
 a plurality of cyclic retrieval means, each connected to and combined with one of said control store means for cyclic retrieval of stored status information from said control store means;
 
 
 25
 control data source means interconnected with said control store means for interrogating and modifying information stored in said control store means; and
 
 
 26
 step control signal input means to said control store means for activating information retrieval and modification, whereby said switch is capable of distributed operation, allowing time switch elements to be physically separated from space switch elements of the switch and allowing space switch elements to be physically separated from time switch elements of said switch.
 
 
 27
 The remaining asserted claims, 37-39, 43 and 47-48, each ultimately depend from claim 34. Claim 38, claiming "[t]he improvement of the switch of claim 34 further characterized by said control store means being a random access memory," is typical.
 
 
 28
 We agree with AT & T that substantial evidence supports the jury's verdict that the 5ESS switch does not literally infringe claim 34. The focus of the dispute is on the limitations requiring separate time and space switch modules. Two witnesses for AT & T, Professor Stephen Szygenda and Mr. Ralph Wilson, testified that the TSIU time division module contains time and space switches subject to common control. Ample documentary evidence and trial exhibits, including technical literature, demonstrative charts and circuit diagrams, buttressed this testimony. Although Collins cross-examined AT & T's witnesses and offered its own testimony, principally to the end of establishing that the time and space switches of the accused device may also operate under individual control, a finding of infringement on that basis ignores the claim language that time and space switches must not be "combined with any time signal path switching means...." Viewing all the evidence presented at trial in the light most favorable to AT & T, see Read, 970 F.2d at 823, 23 USPQ2d at 1432, we conclude that the jury reasonably determined that Collins did not prove by a preponderance of the evidence that the 5ESS switch literally met the properly interpreted language of claim 34.
 
 
 29
 Claim 34 is the only independent claim of the '593 patent that Collins asserts against AT & T. Because claim 34 is not literally infringed, no dependent claim can be literally infringed. See Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1552 n. 9, 10 USPQ2d 1201, 1207 n. 9 (Fed.Cir.1989). We thus conclude that a reasonable jury could only have found that AT & T did not infringe claims 34, 37-39, 43, and 47-48 of the '593 patent.
 
 III.
 Discovery Sanctions
 
 30
 AT & T also appeals the order of the district court holding it in contempt for abuse of discovery, contending that it was a criminal contempt sanction entered without the required procedural safeguards. According to AT & T, the district court failed to provide notice of the prosecution of a criminal contempt as mandated by Fed.R.Crim.P. 42(b).[2] Collins instead asserts that the contempt order was civil in nature and thus not requiring of notice.
 
 
 31
 A "contempt order ... is characterized as either civil or criminal depending upon its primary purpose." Lamar Fin. Corp. v. Adams, 918 F.2d 564, 566 (5th Cir.1990); accord Petroleos Mexicanos v. Crawford Enters., 826 F.2d 392, 399 (5th Cir.1987); Port v. Heard, 764 F.2d 423, 426 (5th Cir.1985); In re Dinnan, 625 F.2d 1146, 1149 (5th Cir.1980). If the order has a punitive purpose and is intended to vindicate the authority of the court, it will be considered a criminal order. Hicks v. Feiock, 485 U.S. 624, 631-35 (1988); United States v. United Mine Workers, 330 U.S. 258, 302-03 (1947); Lamar Fin. Corp., 918 F.2d at 566; Port, 764 F.2d at 426; Dinnan, 625 F.2d at 1149; In re Stewart, 571 F.2d 958, 963 (5th Cir.1978). A civil contempt sanction is instead intended "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation." Lamar Fin. Corp., 918 F.2d at 566; accord Hicks, 485 U.S. at 631-35; United States v. United Mine Workers, 330 U.S. at 303-04; Port, 764 F.2d at 426; Dinnan, 625 F.2d at 1149; Stewart, 571 F.2d at 963.
 
 
 32
 A principal distinction between the two sorts of orders is whether the imposed sanctions are absolute or conditional. Hicks, 485 U.S. at 633-35; Lamar Fin. Corp., 918 F.2d at 566; In re Rumaker, 646 F.2d 870, 871 (5th Cir.1980); Dinnan, 625 F.2d at 1149. A fine payable "regardless of purgation of the contempt could not be classified as other than punitive," and therefore as a criminal contempt sanction. Port, 764 F.2d at 426 (citations omitted). In contrast, an important factor indicating that a contempt adjudication is civil is the ability of the contemnor to avoid the sanction by complying with the order. Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 903 F.2d 1568, 1578-79, 14 USPQ2d 1913, 1922 (Fed.Cir.1990).
 
 
 33
 By its December 18, 1991 Order, the district court approved the magistrate judge's October 8, 1991 order sanctioning AT & T, which stated in part:
 
 
 34
 In order to deter further abuses of discovery procedures, and, hopefully, to prevent further contentious violations of the Orders of the Court, IT IS ORDERED that Defendant AT & T shall, on or before October 10, 1991 at 12:00 p.m. Central Standard Time, pay to Plaintiff the sum of $50,000.00.
 
 
 35
 It is immediately apparent that the required payment could not be mitigated; AT & T could do nothing to purge its contempt. The unconditional nature of an order's sanctions weighs heavily against a finding of a coercive purpose. Although the Order names Collins Licensing as the recipient of this payment, we also cannot conclude that the court's purpose was compensatory. No evidence suggests that the $50,000 figure accounts for any actual expenses or other losses incurred by Collins Licensing due to AT & T's conduct during discovery. United States v. United Mine Workers, 330 U.S. at 304.
 
 
 36
 While the court's stated rationale was one of deterrence, rather than punishment, such characterizations do not control our determination. Shillitani v. United States, 384 U.S. 364, 369 (1966); Rumaker, 646 F.2d at 871; Dinnan, 625 F.2d at 1149. Indeed, we have noted that "most criminal punishment is intended, among other things, to deter the criminal from committing other crimes." Spindelfabrik, 903 F.2d at 1580, 14 USPQ2d at 1922-23; see also Hicks, 485 U.S. at 635-36 (noting the overlapping aspects of civil and criminal contempt). Even if we consider the district court to have possessed dual purposes when issuing its order, contempt orders containing both punitive and coercive aspects are generally to be considered criminal in nature. Lamar Fin. Corp., 918 F.2d at 567; Port, 764 F.2d at 426; Rumaker, 646 F.2d at 872. See also Union Tool Co. v. Wilson, 259 U.S. 107, 110 (1922) ("Where a fine is imposed partly as compensation to the complainant and partly as punishment, the criminal feature of the order is dominant and fixes its character for purposes of review."). From our reading of the record, see Rumaker, 646 F.2d at 871, we conclude that the order was at least partially criminal in nature and was entered without the appropriate procedural safeguards.
 
 
 37
 This outcome is unaltered by Collins' citation of Brown v. Braddick, 595 F.2d 961, 203 USPQ 95 (5th Cir.1979), for the proposition that "[t]he absence of compliance with [Fed.R.Crim.P.] 42(b) supports an inference that the contempt order was intended to be civil." Id., 595 F.2d at 965 n. 6, 203 USPQ at 100 n. 6 (citation omitted). In Brown, an appeal stemming from discovery in a patent interference, the Court of Appeals stayed the district court's contempt proceedings. Id., 595 F.2d at 964, 203 USPQ at 99. But unlike the instant case, the district court in Brown had not yet issued an order. Where a contempt order has issued, we are compelled by Hicks, 485 U.S. 624 (1988), to reach "conclusions about the purposes for which relief is imposed ... from an examination of the character of the relief itself." Id. at 636.
 
 
 38
 Because we conclude that the district court imposed criminal sanctions against AT & T, we vacate that portion of its contempt order ordering the payment of $50,000.00 to Collins on or before October 10, 1991. However, we do not preclude the district court from sanctioning any misconduct by AT & T committed prior to October 7, 1991.
 
 IV.
 Costs
 
 39
 Each party to bear their own costs.
 
 
 
 *
 Honorable Avern Cohn, District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 A tandem exchange is a telephone switch handling traffic between those switches in which subscriber's lines are terminated. Dennis Longley & Michael Shain, Dictionary of Information Technology 197, 331 (2d ed. 1986). PCM refers to pulse code modulation, a technique for transmitting analog information in digital from through sampling, conversion of the sampled value into a fixed length binary number, and transmission of that number as a corresponding set of pulses. Id. at 278
 
 
 [2]
 Fed.R.Crim.P. 42(b) provides:
 A criminal contempt ... shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant, or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest.... Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.