**D.S.A., Petitioner–Appellant,**

v.

**CIRCUIT COURT BRANCH 1, Rock County Juvenile Probation Department, John Whitcomb and Donald Hanaway, Respondents–Appellees.**

No. 89–2871.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1990.

Decided Sept. 5, 1991.

Glenn Reynolds (argued), O'Brien & Reynolds, Madison, Wis., for petitioner-appellant.

Sally L. Wellman, Asst. Atty. Gen. (argued), Wisconsin Dept. of Justice, Madison, Wis., for respondents-appellees.

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

D.S.A. was adjudicated delinquent for her participation in the murder of Anthony Darnell Wilson. D.S.A. brought two motions for a new trial that were denied. The Wisconsin Court of Appeals affirmed the trial court's decisions, and the Wisconsin Supreme Court denied D.S.A.'s petition for review. D.S.A. filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we affirm the district court's dismissal of the petition.

I

BACKGROUND

The body of nine-year-old Anthony Darnell Wilson was found on July 27, 1985, in Beloit, Wisconsin. It was determined that he had been murdered the previous night. Wilson died of multiple stab wounds to the chest, head, and neck.

Pursuant to Wis.Stat. § 48.13(12), a Child in Need of Protection and Services petition was filed against eleven-year-old D.S.A. The petition alleged that D.S.A. was a participant in the murder. Delinquency petitions were filed against D.S.C., age 12, and R.E.W., age 14. The three proceedings were held before different judges and were conducted separately. In each proceeding, the jury found that the juvenile was delinquent for his/her participation in the murder.

D.S.A. brought a motion for a new trial[1] on the basis of newly discovered evidence that D.S.A. believed demonstrated her innocence. This evidence consisted of allegations of adult involvement in the murder, medical expert opinion that D.S.A. could not have committed the murder, and an expert's view of the reliability of one of the state's witnesses (who was five years old). The trial court refused to permit D.S.A. to call witnesses at an evidentiary hearing and ultimately denied her motion. D.S.A. appealed the trial court's rulings, contest-

---

1. Although the parties and the trial court referred to D.S.A.'s "trial" and to a "new trial," as the Wisconsin Court of Appeals noted, the proper terms are "hearing" and "rehearing." See R.

14 Ex. N at 2 n. 1. Like the Wisconsin Court of Appeals, we have followed the trial court's and the parties' usage to avoid confusion.

ing the court's refusal to allow her to call witnesses. While the case was on appeal, R.E.W. gave an in-court confession to the killing. D.S.A. then filed a second motion for a new trial based on this confession. The Wisconsin Court of Appeals remanded D.S.A.'s first appeal to enable the trial court to hear the second motion for a new trial.

The trial court granted the state's request for an evidentiary hearing to evaluate the inherent credibility of the confession. R. 12 at 122. Only R.E.W. and witnesses who had taken earlier statements from R.E.W. were permitted to testify at the hearing. The state called four witnesses to support its contention that the confession was inherently incredible and therefore did not have sufficient probative weight to merit a new trial. The court refused to allow D.S.A. to call forensic experts to testify about the consistency between the physical evidence and R.E.W.'s confession. The court reasoned that the physical evidence adduced at trial, as well as the comments from the experts who testified at the trial, obviated the need for repeating the trial record.

Although another court had granted D.S.C.'s motion for a new trial on the basis of R.E.W.'s confession, the trial court denied D.S.A.'s motion. In rejecting D.S.A.'s motion, the court determined that the confession was inherently incredible because R.E.W. had given a number of conflicting statements concerning the killing and that, in any event, the confession did not foreclose D.S.A.'s participation in the murder. D.S.A. filed a second appeal, claiming that

the court's refusal to allow her to present evidence at the evidentiary hearing violated her constitutional right to due process.

The Wisconsin Court of Appeals consolidated both of D.S.A.'s appeals. 145 Wis.2d 904, 430 N.W.2d 379. The court rejected D.S.A.'s arguments and concluded that the trial court had not abused its discretion by denying her motions for a new trial. D.S.A. proceeded to file a petition for writ of habeas corpus. In her petition, D.S.A. requested the district court to hold an evidentiary hearing to evaluate the trustworthiness of the new evidence that D.S.A. had attempted to admit in the state court proceedings. The district court denied both the motion for an evidentiary hearing and the petition. The court held that D.S.A.'s constitutional rights were not implicated by her inability to call witnesses at hearings on post-trial motions and that there is no federal constitutional right to a new trial on the basis of newly discovered evidence.

II

ANALYSIS

A. *Mootness*

We first address the state's argument that D.S.A.'s appeal is moot because she is no longer in custody and suffers no collateral consequences as a result of her adjudicated delinquency.

1. General principles

■ The basic principles that govern the issue of mootness[2] are well established. In *Carafas v. La Vallee*, 391 U.S. 234, 240,

---

2. A federal court's inability to "review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964). "Federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam).

Mootness should not be confused with the statutory requirement that the habeas petitioner be in custody. Section 2254(a) of 28 U.S.C. provides, in pertinent part, that federal courts

"shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Because D.S.A. filed her habeas petition one day before being released from custody, she fulfills the custody requirement. *See Carafas v. La Vallee*, 391 U.S. 234, 240, 88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968). *See generally Hensley v. Municipal Court*, 411 U.S. 345, 351, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973). *Cf. Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (habeas available to child custody matters).

88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968), the Supreme Court established that a petition for habeas corpus is not rendered moot by the mere release of the petitioner from custody. A petitioner, although released from custody, may continue to seek the writ if collateral consequences—lingering disabilities or burdens resulting from the conviction—are sufficient to give the petitioner " 'a substantial stake in the judgment of conviction which survives the satisfaction of the sentences imposed on him.' " *Id.* at 237, 88 S.Ct. at 1559 (quoting *Fiswick v. United States*, 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946)). The *Carafas* Court found that, because of his conviction, the petitioner could not engage in certain businesses, vote in state elections, or serve as a juror; these collateral consequences were sufficient for the Court to hold that the petitioner's cause was not moot. *See id.* at 237, 88 S.Ct. at 1559.

Although these disabilities usually exist in the case of a criminal felony conviction,[3] there can be circumstances when the underlying conviction leaves no such residue and the case is moot upon the petitioner's release from incarceration. For instance, in *Broughton v. North Carolina*, 717 F.2d 147 (4th Cir.1983), *cert. denied*, 466 U.S. 940, 104 S.Ct. 1917, 80 L.Ed.2d 464 (1984), the petitioner was cited for criminal contempt because of her outburst in a state civil trial. Her thirty-day sentence expired five days after the district court dismissed her petition for habeas corpus. While acknowledging the rule in *Carafas*, the

Fourth Circuit determined that it was inapplicable in the case before it:

> Broughton, however, will suffer none of these collateral consequences as a result of her misdemeanor contempt conviction. The contempt conviction, for example, will not prevent her from voting, serving on a jury, obtaining a license to practice law, becoming an official of a labor union, or qualifying for state elective offices. Nor will the criminal conviction expose her to the possibility of an enhanced sentence if she commits a later criminal act.

717 F.2d at 149 (citations omitted).[4]

*Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982), has complicated to some extent the application of these settled principles. In *Lane*, the petitioners challenged the confinement imposed upon them when they violated their parole after serving their prison sentences. The petitioners argued that their constitutional rights were violated because they were not informed at the time of their original guilty pleas on the underlying crimes that their prison sentences would be followed by a parole term. The Supreme Court noted that, if the petitioners "had sought the opportunity to plead anew" to the underlying criminal charges, the case would not be moot because such relief would free them from "all consequences flowing from their convictions." *Id.* at 630, 102 S.Ct. at 1326. However, because they already had served the original sentences,[5] they simply sought to remove "the consequence that gave rise to the constitutional harm," the parole

---

**3.** In *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct. 1889, 1898, 20 L.Ed.2d 917 (1968), the Supreme Court presumed that there are collateral consequences from a criminal conviction and that it is moot "only if it is shown that there is no possibility that any collateral consequences will be imposed on the basis of the challenged conviction." *Id.* at 57, 88 S.Ct. at 1900. Courts subsequently have interpreted *Sibron* as placing the burden on the state to show that there is no possibility of collateral consequences from the challenged conviction. *See, e.g., Malloy v. Purvis*, 681 F.2d 736, 739 (11th Cir.1982), *cert. denied*, 460 U.S. 1071, 103 S.Ct. 1527, 75 L.Ed.2d 949 (1983).

**4.** The *Broughton* court acknowledged that the petitioner had continued reputational interests,

but held that such interests were not sufficient to avoid the mootness doctrine under *Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982). *See* 717 F.2d at 149. This circuit also has stated that, under *Lane*, an impugned reputation is not a sufficient collateral consequence to save a habeas petition from mootness. *Wickstrom v. Schardt*, 798 F.2d 268, 270 (7th Cir.1986) (per curiam).

**5.** This choice of remedies also ensured that they would not receive a higher sentence on retrial. *Cf. North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *rev'd on other grounds*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

term. This consequence, noted the Court, "expired of its own accord." *Id.* at 631, 102 S.Ct. at 1327. The petitioners "are no longer subject to any direct restraint as a result of the parole term." *Id.* The Court concluded that, "[s]ince [petitioners] elected only to attack their sentences and since those sentences expired during the course of these proceedings, this case is moot." *Id.*

As our colleagues in other circuits have noted, *Lane* held that the petition for habeas corpus was moot because it attacked only a *sentence* that already had been served.[6] Those matters that might have generated lingering consequences under the rule of *Carafas*—the underlying conviction and the finding that they had violated parole—were never attacked. *Id.* 455 U.S. at 631, 633, 102 S.Ct. at 1327, 1328.[7]

Indeed, the Fifth Circuit has stressed that *Lane* requires a specific focus on the relief sought in order to determine whether a release from custody renders a petition for habeas corpus moot. *See Port v. Heard,* 764 F.2d 423, 428 (5th Cir.1985). It is clear that the precise holding of *Lane* has no direct application to the present case. Here, unlike in *Lane,* the petitioner is attacking the underlying adjudication of her conduct as well as the sentence imposed.

### 2. Application to this case

■ We next must consider what, if any, consequences remain from the petitioner's juvenile adjudication now that she is not in custody. We begin with Wisconsin Statute § 48.35(1)(b), which we set out in full at the margin.[8] This provision makes clear that

---

6. *See, e.g., United States v. Spawr Optical Research, Inc.,* 864 F.2d 1467, 1470 (9th Cir.1988) (Court in *Lane* "emphasized that the petition would not have been moot if the petitioner had challenged the conviction itself."), *cert. denied,* —— U.S. ——, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989); *Vandenberg v. Rodgers,* 801 F.2d 377, 378 (10th Cir.1986) (finding petitioner's appeal moot under *Lane* because petitioner failed to attack underlying conviction; "[t]hus, this case is distinguishable from decisions rejecting a claim of mootness because a petitioner faces continuing negative consequences as a result of a defective conviction."); *Port v. Heard,* 764 F.2d 423, 427 (5th Cir.1985) ("Had the petitioners [in *Lane*] challenged the underlying convictions and requested an opportunity to replead, ... the cases would not have been moot."); *United States v. Cooper,* 725 F.2d 756, 757–58 (D.C.Cir.1984) ("In *Lane,* the Supreme Court relied heavily on the fact that the petitioners were attacking only their sentences."). *Compare Aaron v. Pepperas,* 790 F.2d 1360, 1362 (9th Cir. 1986) (where petitioner did not attack validity of underlying conviction, "possibility that the imposition of a prison sentence may appear relevant to a judge or parole commission in subsequent proceedings does not constitute actual harm") *with Reimnitz v. State's Attorney of Cook County,* 761 F.2d 405, 408 (7th Cir.1985) (where petitioner attacked validity of underlying conviction on double jeopardy grounds, possible use of manslaughter conviction to enhance punishment for later crime was sufficient collateral consequence to keep appeal alive).

7. Substantial Supreme Court authority supports the proposition that a challenge to a particular sentence, as opposed to a challenge to the underlying conviction, is moot after the sentence has been served because there are no collateral legal consequences to the sentence itself. *See*

*North Carolina v. Rice,* 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *see generally Jacobs v. New York,* 388 U.S. 431, 87 S.Ct. 2098, 18 L.Ed.2d 1294 (1967) (per curiam).

8. 48.35. Effect of judgment and disposition

(1) The judge shall enter a judgment setting forth his or her findings and disposition in the proceeding.

(a) A judgment in proceedings on a petition under this chapter is not a conviction of a crime, shall not impose any civil disabilities ordinarily resulting from the conviction of a crime and shall not operate to disqualify the child in any civil service application or appointment.

(b) The disposition of a child, and any record of evidence given in a hearing in court, shall not be admissible as evidence against the child in any case or proceeding in any other court except:

1. In sentencing proceedings after conviction of a felony or misdemeanor and then only for the purpose of a presentence study and report;

2. In a proceeding in any court assigned to exercise jurisdiction under this chapter; or

3. In a court of civil or criminal jurisdiction while it is exercising the jurisdiction of a family court and is considering the custody of children.

(c) Disposition by the court assigned to exercise jurisdiction under this chapter of any allegation under s. 48.12 shall bar any future proceeding on the same matter in criminal court when the child reaches the age of 18. This paragraph does not affect proceedings in criminal court which have been transferred under s. 48.18.

(2) Except as specifically provided in sub. (1), this section does not preclude the court from

the civil disabilities "ordinarily resulting from the conviction of a crime" do not attach to a juvenile petition. But the judgment may be considered in any future presentence study or report, in future juvenile proceedings, or when a court exercises the jurisdiction of a family court and considers the custody of children.

The first of these exceptions to the prohibition against use of juvenile adjudications—use in a criminal presentencing report—certainly requires close scrutiny on our part. In *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court appeared to have eschewed a parsing of state law and permitted a finding of mootness only if the state demonstrated that "there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Id.* at 57, 88 S.Ct. at 1900. However, the "presumption" of collateral consequences found in *Sibron* arguably was rejected in *Lane*. Although unnecessary to its holding, the Court in *Lane* responded in a footnote to Justice Marshall's suggestion in dissent that the "presumption" of *Sibron* had been eliminated:

> In his dissenting opinion, JUSTICE MARSHALL argues that this case is not moot because a possibility exists under state law that respondents' parole violations may be considered in a subsequent parole determination. This "collateral consequence" is insufficient to bring this case within the doctrine of *Carafas*. That case concerned existing civil disabilities; as a result of the petitioner's conviction, he was presently barred from holding certain offices, voting in state elections, and serving as a juror. This case involves no such disability. The parole violations that remain a part of respondents' records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring. Moreover, the existence of a prior

parole violation does not render an individual ineligible for parole under Illinois law. It is simply one factor, among many, that may be considered by the parole authority in determining whether there is a substantial risk that the parole candidate will not conform to reasonable conditions of parole.

> Collateral review of a final judgment is not an endeavor to be undertaken lightly. It is not warranted absent a showing that the complainant suffers actual harm from the judgment that he seeks to avoid.

455 U.S. at 632 n. 13, 102 S.Ct. at 1327 n. 13. Since the petitioners in *Lane* never attacked their underlying parole violations, *see* 455 U.S. at 633, 102 S.Ct. at 1328, this discussion is *dicta*. Nevertheless, read unanchored from the text it explicates, this footnote in *Lane* might suggest that a record of a parole violation does not constitute a collateral consequence because: (1) the petitioner controls the consequence because it is only triggered by later criminal conduct; and (2) it is only a factor to be considered among many in any future adjudication and is not necessarily outcome determinative.

Assuming that this *dicta* has relevance beyond parole violations, the first of these rationales has not endured. Indeed, this circuit apparently never accepted such an interpretation of *Lane* as a statement of governing law. Writing for the court in *Reimnitz v. State's Attorney of Cook County*, 761 F.2d 405, 408 (7th Cir.1985), Judge Posner, citing *Lane*, determined that "the possibility that the conviction might someday be used to enhance his punishment for a later crime [is] enough to keep the proceeding alive after his release from custody." In *Evitts v. Lucey*, 469 U.S. 387, 391 n. 4, 105 S.Ct. 830, 833 n. 4, 83 L.Ed.2d 821 (1985) (emphasis supplied), the Supreme Court also explicitly recognized that the possible use of a criminal record in a future prosecution was a collateral consequence:

---

disclosing information to qualified persons if the court considers the disclosure to be in the

best interests of the child or of the administration of justice.

The Commonwealth informed this Court five days prior to oral argument that respondent had been finally released from custody and his civil rights, including suffrage and the right to hold public office, restored as of May 10, 1983. However, respondent has not been pardoned and *some collateral consequences of his conviction remain, including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution* if he should go to trial on any other felony charges in the future. This case is thus not moot.

This statement has been interpreted by at least one other court of appeals as indicating that a criminal record that might affect a later sentence is a sufficient collateral consequence to save an appeal from mootness. *See Robbins v. Christianson,* 904 F.2d 492 (9th Cir.1990).[9]

The second rationale for refusing to find collateral consequences in *Lane*—that a parole violation would be only one of many factors in any future adjudications—leaves us no firm footing for decision. By its terms, the discussion in *Lane* is limited to the use of a parole violation in subsequent parole violation hearings—a far cry from the use of a record of a child murder in a subsequent criminal sentencing. On the other hand, the Court in *Evitts* specifically held only that collateral consequences were present because the petitioner's felony conviction would subject him to "persistent felony prosecution." We believe that restricting *Evitts* to the proposition that a criminal record is a collateral consequence *only* when it can be used to invoke an habitual offender statute is asking the *dicta* in the *Lane* footnote to go above and beyond the call of duty. We know of no circuit that has given the *Evitts* footnote such a reading. Indeed, in a pre-*Evitts* case, this court rejected implicitly such an interpretation of the collateral consequence rule.[10]

We turn now to the second use of juvenile adjudications permitted by Wisconsin law. As we have indicated above, Wisconsin law permits the record in this case to be used in subsequent juvenile proceedings against D.S.A. *See* Wis.Stat. § 48.35. Certainly, the interest of the juvenile in an accurate adjudication of any future juvenile proceeding justifies the collateral consequence doctrine of *Carafas.*[11]

**9.** *See also White v. White,* 925 F.2d 287, 290 (9th Cir.1991) (finding that sexual contact with minor charge that could be used in subsequent criminal action satisfied collateral consequences exception to mootness doctrine) (citing *Robbins*); *Sanchez v. Mondragon,* 858 F.2d 1462, 1463 n. 1 (10th Cir.1988) ("we are convinced that the collateral consequences remaining from an unpardoned conviction are sufficient to preclude mootness") (citing *Evitts v. Lucey,* 469 U.S. 387, 391 n. 4, 105 S.Ct. 830, 833 n. 4, 83 L.Ed.2d 821 (1985)); *see also Broughton v. North Carolina,* 717 F.2d 147, 149 (4th Cir.1983) (possibility that conviction might be used to enhance sentence constitutes collateral consequence); *Malloy v. Purvis,* 681 F.2d 736, 740 (11th Cir.1982) (Wisdom, J., concurring) (finding collateral consequence if " 'offense[ ] may affect the petitioner's credibility, his eligibility for parole, [or] may subject him to harsher sentencing if in the future he is in trouble with the law' ") (quoting *Harrison v. Indiana,* 597 F.2d 115, 118 (7th Cir.1979)).

**10.** In *Clay v. Director,* 564 F.Supp. 206 (N.D.Ill. 1983), the district court considered the habeas petition of a juvenile after she received a complete discharge from her juvenile adjudication.

The district court, however, determined that the case was not moot.

When Clay first brought this habeas action, she was on parole from a commitment to Department until her twenty-first birthday. Then on July 2, 1979 she received a full discharge from Department. That discharge does not moot this litigation, for Clay still suffers a serious "collateral consequence" of her delinquency adjudication: the potential for harsher sentencing on any future conviction.

*Id.* at 207 n. 1. On appeal, this court apparently agreed with the district court's mootness analysis. In fact, this court reversed the district court's order dismissing the petition on nonexhaustion grounds and remanded it for consideration of the petition's merits. *See* 749 F.2d 427 (7th Cir.1984).

**11.** The Court has extended the fourteenth amendment's guarantee against deprivation of liberty without due process of law to minors involved in juvenile proceedings. *See In re Gault,* 387 U.S. 1, 33–37, 87 S.Ct. 1428, 1446–1449, 18 L.Ed.2d 527 (1967). " 'Neither man nor child can be allowed to stand condemned by methods which flout constitutional require-

Although this juvenile adjudication apparently cannot be used to impeach the credibility of D.S.A. in any future criminal proceeding against herself, *see Sanford v. State*, 76 Wis.2d 72, 250 N.W.2d 348, 352–53 (1977), it can be used to impeach her credibility if she were to appear as a witness in a criminal proceeding against another.[12]

Finally, we note that the governing statute also permits the use of the records of juvenile proceedings in future proceedings involving the custody of children. D.S.A.'s interest in any future proceedings involving her custody, or, at a later date, the custody of her children, justifies characterizing the civil disabilities that flow from a juvenile conviction as collateral consequences under the *Carafas* rule.

In sum, we believe that collateral consequences sufficient to give D.S.A. a substantial stake in the outcome of this case remain. Under the law of Wisconsin, D.S.A.'s juvenile adjudication as a participant in the murder of a child may be used in a presentence report to increase a subsequent sentence, to impeach her testimony, and in subsequent custody proceedings. Based on the Supreme Court's decisions in *Evitts* and *Carafas*, D.S.A.'s appeal is not moot.

**B. *Application of Due Process Clause***

■ The state also argues that *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), precludes application of the due process clause to

D.S.A.'s post-verdict motions. In *Finley*, the Supreme Court refused to extend the due process clause to post-conviction proceedings that were purely collateral attacks on the conviction. Central to the Court's decision was its characterization of collateral relief sought by the petitioner in *Finley*: "Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction." *Id.* at 557, 107 S.Ct. at 1994.

Yet we believe that the appeals process through which D.S.A.'s motions were made is entirely different in character from that found by the Supreme Court in *Finley* not to require due process protection. D.S.A.'s post-verdict motions were a combination of technical motions dealing with the trial itself[13] and motions for a new trial based upon newly discovered evidence. Under Wisconsin law, the petition for a new trial at issue here is intertwined with issues on direct appeal; the Wisconsin Supreme Court has stated that the failure to bring a post-verdict motion may result in waiver of an issue on appeal. *See State v. Monje*, 109 Wis.2d 138, 325 N.W.2d 695, 702 (1982) (for alleged trial errors to be considered as a matter of right, post-conviction motions must be made), *rev'd in part on other grounds*, 131 Wis.2d 220, 388 N.W.2d 601 (1986). Thus, it is clear that the post-

---

ments of due process of law.'" *Id.* at 13, 87 S.Ct. at 1436 (quoting *Haley v. Ohio*, 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948) (plurality opinion)); *see also Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).

**12.** The Supreme Court has held that juvenile adjudications may be used in cross-examination. "The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Davis v. Alaska*, 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974). *See generally Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (per curiam); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104, 99 S.Ct.

2667, 2671, 61 L.Ed.2d 399 (1979). The Court reasoned that "[t]he State could have protected [the witness] from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; the State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records." *Id.*

**13.** D.S.A.'s first motion for a new trial also included the following arguments: that the court should have changed venue and struck two jurors for cause, that insufficient evidence supported the verdict, that an eyewitness was incompetent, that evidentiary errors were committed, and that she was denied her right to present a meaningful defense at trial.

verdict motions brought by D.S.A. were part of the appeal process and not collateral to it. *See State v. Krysheski*, 119 Wis.2d 84, 349 N.W.2d 729, 732 (App.1984) ("Because a motion for a new trial under Rule 809.30 ... is a prerequisite to further appellate review, ... the motion is a part of the appeal process.").[14] Because D.S.A.'s post-verdict motions were an integral part of her first appeal as of right, the due process clause applied to her post-conviction proceedings. *See Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985) ("if a State has created appellate courts as an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant, ... the procedures used in deciding appeals must comport with the demands of the Due Process Clause").

## C. *Application of Due Process Clause to D.S.A.'s Motions*

### 1. The post-verdict proceedings in the Wisconsin courts

In her first motion for a new trial, D.S.A. argued that she was entitled to a new trial on the basis of newly discovered evidence. This evidence consisted of informant evidence of possible involvement in the murder by another person, forensic and psychological evidence, and an attack on the admissibility of the testimony of a five-year-old who witnessed the murder. The Wisconsin Court of Appeals noted that the decision to grant or deny a new trial rests in the discretion of the trial court. Whether to order a new trial involves analysis at two levels: first, the existence of newly discovered evidence must be shown; second, the evidence must be of such character as to affect the advisability of the original adjudication. R. 12 Ex. N at 44; *see also Zapuchlak v. Hucal*, 82 Wis.2d 184, 262 N.W.2d 514, 522 (1978). The court of appeals concluded that the trial court did

not abuse its discretion by characterizing most of the informant and forensic evidence as newly developed, not newly discovered. As for the testimony of the five-year-old witness, the court of appeals stressed that, under Wisconsin law, every person is competent to be a witness. The result of this law is that opponents must shift their emphasis from an attack on competency to an attack on weight and credibility through the use of cross-examination and the introduction of refuting evidence. R. 12 Ex. N at 20; *Zapuchlak*, 262 N.W.2d at 522. The Wisconsin Court of Appeals thus held that the trial court did not abuse its discretion by rejecting D.S.A.'s first motion for a new trial.

In her second motion for a new trial, D.S.A. argued that R.E.W.'s confession required the trial court to grant a new trial. The trial court held an evidentiary hearing to assess the probative value of R.E.W.'s confession and found R.E.W. to be "almost a chronic liar, a person who had given inconsistent statements into the teens." R. 12 Ex. N at 50. The trial court concluded that a new trial should not be granted because it determined that R.E.W.'s testimony was inherently incredible on the basis of the number of different versions of the facts surrounding the murder he had given and on the basis of his most recent confession's conflicts with the physical evidence presented at trial.

D.S.A. argued to the Wisconsin Court of Appeals that the trial court erred in focusing on R.E.W.'s credibility at the evidentiary hearing, contending that a jury rather than the trial court should have decided whether R.E.W.'s confession should be discounted completely. The court of appeals rejected this argument and determined that it was within the court's discretion to deny a new trial on the basis of evidence that a reasonable jury would not believe. *Id.* at

---

**14.** The State contends that we should find dispositive the line of cases holding that challenges to a State's postconviction proceedings are not cognizable on federal habeas corpus because such challenges do not go to the legality of the detention. *See, e.g., Hopkinson v. Shillinger*, 866 F.2d 1185, 1218–19 (10th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3256, 111 L.Ed.2d

765 (1990); *Spradley v. Dugger*, 825 F.2d 1566 (11th Cir.1987). These cases involved motions that were purely collateral to the conviction. However, as we indicate in the text, D.S.A.'s motions are more appropriately characterized as post-verdict motions not collateral to the conviction.

52. The court also stressed the trial court's finding that R.E.W.'s confession was inherently incredible (because it conflicted with the physical evidence) on the issue of whether another person was present when Wilson was killed. Because D.S.A. was charged only with being a party to the crime, R.E.W.'s confession that he killed Wilson did not automatically entitle D.S.A. to a new trial.[15]

D.S.A.'s final argument, based on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), was that the denial of her motion for a new trial prevented her from presenting a defense. She contended that, if she could not present R.E.W.'s confession to a jury, her right to present a defense would be frustrated. The court of appeals rejected this argument on the ground that *Chambers* involved rejected testimony that bore persuasive assurances of trustworthiness.

## 2. The district court's assessment

In her habeas petition, D.S.A. contended that she was "denied her constitutional right to present a defense, to compulsory process and to due process as enunciated in *Chambers v. Mississippi*." R. 1 at 1.[16]

The district court rejected the argument that *Chambers* confers a right to have a hearing, at which the appellant could call witnesses, on post-verdict motions for a new trial. The court did recognize that

*Chambers* gives the right to present a defense at trial and that post-trial orders could affect this right. But the court found that D.S.A.'s first motion for a new trial (on the basis of adult involvement and forensic evidence) was distinguishable from the evidence proffered in *Chambers*. In contrast to the evidence in *Chambers*, the court found D.S.A.'s evidence to be conclusory and speculative. Similarly, the court determined that the evidence (R.E.W.'s confession) serving as the basis for D.S.A.'s second motion for a new trial did not have the persuasive assurances of trustworthiness that existed in *Chambers*.[17] R. 29 at 7–8. Thus, the district court held that the trial court had not denied D.S.A. her constitutional right to present a defense by not permitting D.S.A. to call witnesses in support of her motions for a new trial.

## 3. Discussion

■ Even were we to assume that *Chambers* extends to post-verdict motions, D.S.A. would still receive no comfort from this decision. Unlike in *Chambers*, no mechanistic application of state rules was used to arbitrarily deny D.S.A. a fair hearing. As both the trial court and the Wisconsin Court of Appeals noted, most of D.S.A.'s evidence forming the basis for her first motion for a new trial was not newly discovered but newly developed. The trial court certainly committed no constitutional

---

**15.** D.S.A. also argued that the trial court applied too stringent a standard for granting a new trial. The court of appeals rejected this argument because the district court determined that, as a result of R.E.W.'s inherent incredibility, R.E.W.'s confession did not satisfy the first level of the new trial analysis (that newly discovered evidence actually exist). D.S.A. does not make this argument in this court.

**16.** In *Chambers*, a third person confessed to a murder for which Chambers had been charged, but this third person repudiated his confession at trial. Chambers was prevented under a state rule of evidence from impeaching the witness at trial with his previous confession. The Supreme Court concluded that, because the rejected testimony bore persuasive assurances of trustworthiness and was critical to Chambers' defense, the mechanistic application of state rules had denied Chambers a fair trial. 410 U.S. at 301–02, 93 S.Ct. at 1048–49.

**17.** D.S.A. did not argue to the district court that the trial court's use of several of R.E.W.'s prior statements, which had been determined to have been involuntary, in evaluating his credibility at the post-trial motion for a new trial violated her due process rights. In fact, neither the Wisconsin state courts nor the district court has been given an opportunity to address this argument. D.S.A.'s sole, cursory reference to this issue was in her motion for reconsideration (although the underlying facts were mentioned in her traverse) of the district court's dismissal of her petition. *See* R. 13 at 12; R. 33 at 8. By raising and developing it for the first time on appeal, D.S.A. has waived this issue. *See, e.g., Steele v. Perez*, 827 F.2d 190, 193 (7th Cir.1987) (failure to raise argument in original habeas petition precludes federal review on appeal); *Carey v. Duckworth*, 738 F.2d 875 (7th Cir.1984) (matter not raised below will not be considered on habeas review).

error by refusing to inquire into evidence that clearly could not form the basis for a new trial. Moreover, the evidence of adult involvement in the crime (or its coverup) does not exonerate those initially charged with the offense. Therefore, the proffered testimony provided no basis for granting a new trial on the ground of newly discovered evidence, and the state trial court was under no federal obligation to hear such testimony.

Nor would *Chambers* entitle D.S.A. to present evidence at the hearing on the reliability of R.E.W.'s confession. D.S.A. was not accused of committing the murder, but of participating in the murder. R.E.W.'s statements that he acted alone and that D.S.A. was not involved in the murder bore no assurance of trustworthiness. Although his statement that he committed the murder was against his penal interest, his statement regarding D.S.A.'s involvement was not. R.E.W. had no motivation not to lie in an attempt to exonerate D.S.A. The inherent untrustworthiness of R.E.W.'s most recent description of the events surrounding the murder also was demonstrated by several glaring inconsistencies with the medical evidence from the trial. *See* R. 12 Ex. N at 49–51. Additionally, R.E.W. had given inconsistent statements "into the teens," making his credibility extremely suspect. *Id.* at 50. In short, R.E.W.'s confession bears no resemblance to the persuasive assurances of trustworthiness surrounding the confession in *Chambers*.

In refusing to permit D.S.A. to call witnesses to corroborate R.E.W.'s statements through recitation of the forensic evidence in the case, the trial court did not arbitrarily deprive D.S.A. of any fundamental right. The trial court limited the testimony at the hearing to R.E.W. and witnesses who had taken statements from him. The court refused to hear expert testimony from either the state or D.S.A., although D.S.A. attempted to call forensic experts. The trial court reasoned that only R.E.W.'s own prior statements (and the circumstances surrounding those statements) were relevant to assessing his inherent credibility, and

that permitting D.S.A. to recall each expert who had testified at trial essentially would involve retrying the case. R. 12 Ex. G at 121–26. We cannot say that this decision arbitrarily denied D.S.A. her right to due process by rendering the proceeding fundamentally unfair. Because the record demonstrates no fatal unevenhandedness, we must reject D.S.A.'s argument. *See Peek v. Kemp,* 746 F.2d 672, 680 (11th Cir.1984), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *Klimas v. Mabry,* 599 F.2d 842, 848 (8th Cir.1979), *rev'd on other grounds,* 448 U.S. 444, 100 S.Ct. 2755, 65 L.Ed.2d 897 (1980).

### Conclusion

For the reasons stated above, the district court's denial of the petition for writ of habeas corpus is affirmed.

AFFIRMED.

EASTERBROOK, Circuit Judge, dissenting.

Before giving the judges and other public officials of Wisconsin our views about what the Constitution requires of them, we should be sure that we have done what the Constitution requires of us. As it happens, we have not. This case is moot. In issuing a judgment that cannot alter anyone's legal entitlements, we claim a power Article III does not allow federal judges to exercise.

Between 1985 and 1988 Wisconsin treated D.S.A. as a "child in need of protection and services" after a judge concluded that at age 11 she participated in a murder. On November 11, 1988, the day before Wisconsin terminated all custody over her, D.S.A. filed a petition for a writ of habeas corpus. Wisconsin practices forgiveness; under Wis.Stat. § 48.35(1)(a) the judgment "is not a conviction of a crime [and] shall not impose any civil disabilities". No one may know about the decision unless a court orders the information released (a rule we have respected by concealing D.S.A.'s name). So far as Wisconsin is concerned, the adjudication counts no more in D.S.A.'s future life than does a spanking. From its outset, this litigation has had nothing to do with the restrictions Wisconsin imposes; it

was filed at the last instant only to obtain an advisory opinion.

*Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), hold that collateral consequences of a criminal conviction may prevent the expiration of imprisonment from mooting a request for collateral relief. Carafas, for example, was barred from holding certain offices, voting in state elections, and serving as a juror. D.S.A. suffers no such disabilities. She argues, instead, that if she commits a future crime the sentencing judge may learn about the adjudication (although under § 48.35(1)(b)(1) it may not be the basis of a recidivism enhancement), that the adjudication may be brought out in cross-examination if in the future she is called as a witness in someone else's trial, and that potential employers may react adversely to the adjudication if they should happen to learn about it. None of these things, however, is a legal disability imposed by the government. See *United States v. Bush*, 888 F.2d 1145 (7th Cir.1989); *Wickstrom v. Schardt*, 798 F.2d 268, 270 (7th Cir.1986). None is "custody", *Maleng v. Cook*, 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989), and the writ runs only in favor of persons held in custody in violation of the Constitution or federal law.

What to do about an unrealized possibility of adverse effects was the subject of *Lane v. Williams*, 455 U.S. 624, 631–34, 102 S.Ct. 1322, 1326–28, 71 L.Ed.2d 508 (1982), which dismissed a collateral attack on the revocation of parole. Before the case could be decided, the prisoners were released; the Court held the case moot because there were no collateral consequences. "At most, certain nonstatutory consequences may occur; employment prospects, or the sentence imposed in a future criminal proceeding, could be affected." 455 U.S. at 632, 102 S.Ct. at 1327. *Lane* holds these insufficient to keep the case alive, because they are not legal consequences of the decision under challenge. As the Court observed, "discretionary decisions that are made by an employer or a sentencing judge ... are not governed by the mere presence or absence of a recorded violation of parole; these decisions may take into consideration, and are more directly influenced by, the underlying conduct". *Id.* at 632–33, 102 S.Ct. at 1327–28. Lest doubt linger, *Lane* remarked that the parolees could avoid enhancement by refraining from violating the law again, and continued, *id.* at 633 n. 13, 102 S.Ct. at 1328 n. 13: "Collateral review of a final judgment is not an endeavor to be undertaken lightly. It is not warranted absent a showing that the complainant suffers actual harm from the judgment that he seeks to avoid."

*Every* feature said to keep D.S.A.'s case alive was present in *Lane* and held insufficient. Granted, *Evitts v. Lucey*, 469 U.S. 387, 391 n. 4, 105 S.Ct. 830, 833 n. 4, 83 L.Ed.2d 821 (1985), complicates matters, for it deemed adequate to stave off mootness the prospect of enhanced sentencing for future crimes, one of the possibilities deemed inadequate in *Lane* —and without citation to *Lane*. It hardly follows, as my colleagues believe, that *Lane* has been overruled by silence. We cannot resolve a conflict in a higher court's decisions. But we can, and should, hold that the possibility of collateral *legal* consequences from D.S.A.'s adjudication is vanishingly small.

A case is moot unless there is a "reasonable expectation", *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982), that this judgment will again haunt these litigants. What this phrase means is a subject of recurring dispute, driven by inability to quantify probabilities. Compare *Honig v. Doe*, 484 U.S. 305, 317–23, 108 S.Ct. 592, 600–04, 98 L.Ed.2d 686 (1988), with *Riverside County v. McLaughlin*, —— U.S. ——, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991). But we do know that either a low probability or doubt about the context of future disputation requires a court to dismiss the case. *Renne v. Geary*, —— U.S. ——, 111 S.Ct. 2331, 2338–40, 115 L.Ed.2d 288 (1991). We also know that the pertinent inquiry is whether *these* litigants will encounter the *same* dispute. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d

350 (1975). My colleagues do not articulate their definition of mootness, but their catalog of potential effects implies a view that a case is not moot unless there is zero probability that the judgment will ever affect the future interaction of the parties, or the relations between one of the parties and some stranger. That is not the test stated in *Lane, Honig, Renne,* or any other decision of the Supreme Court, and it certainly is not implied by the brief footnote in *Evitts.*

The conviction questioned in *Evitts* might have led to a recidivist enhancement; the same parties again would be embroiled in disputing the validity of the conviction. Nothing of the sort lies in store for D.S.A. and Wisconsin. The state has promised through § 48.35 that there will be no future legal consequences. Although it has not forbidden a judge to consider the adjudication if there should be some future custody dispute concerning D.S.A. and her own children (should she have any), there are so many "ifs" and "buts" and "maybes" between here and there that both the possibility of a dispute and the form it will take are hopelessly conjectural. What juries will think of D.S.A.'s testimony in a stranger's case (her adjudication cannot be used to cross-examine her should she be a party) has nothing to do with any dispute between her and the state. It is always possible that someone, somewhere, sometime will learn about the adjudication and hold it against D.S.A. *Lane* held such a possibility insufficient; *Evitts* did not disagree. Using teensy possibilities of extra-legal effects to find a continuing case or controversy between D.S.A. and Wisconsin abolishes the mootness doctrine. I put it to my colleagues: If this case is not moot, please describe one that is.